United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 20, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 02-30357

STEVEN McCLURE; CLAYTON SMITH; MICHAEL BEHAN,

Plaintiffs-Appellees,

versus

JOHN ASHCROFT, sued in his capacity as Attorney General,

Defendant-Appellant.

**Appeal from the United States District Court
for the Eastern District of Louisiana**

Before GARWOOD, SMITH, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

This civil appeal challenges a permanent injunction obtained by third-parties to a final judgment of conviction in an earlier criminal case. That case concerned illegal drug use at the criminal defendant's business premises (theater). Enjoined is enforcement of a plea agreement provision, which the district court accepted and included as part of a special condition in the final judgment. The part in issue requires the criminal defendant and related persons to take reasonable steps to prohibit the introduction of certain legal items into their theater (special condition). Primarily at issue is whether third-parties, who claim

the special condition violates their constitutional rights, have standing to challenge the final criminal judgment. **VACATED and REMANDED.**

I.

This civil action concerns "raves" – high-energy, all-night dance parties, popular with teenagers and young adults, which feature electronic dance music with a fast, pounding beat and choreographed laser and dance programs. U.S. Dept. of Justice, *Information Bulletin: Raves*, Prod. No. 2001-L0424-004 (April 2001). The State Palace Theater (the Theater) in New Orleans, Louisiana, frequently holds raves. Commonly, they last from 10:00 p.m. until 7:00 a.m. and are attended by several thousand people, who pay an entry fee of $10 to $40.

Some attending raves use illegal drugs, particularly 3,4 methylenedioxymethamphetamine (ecstasy). In 1999, the DEA began an investigation of alleged drug use at the Theater. That investigation revealed that, between December 1997 and March 2000, more than 70 people were transported from the Theater to a hospital because of drug overdoses; one seventeen-year-old died. In undercover operations conducted at seven raves at the Theater, DEA agents made 50 purchases of ecstasy or other controlled substances.

Robert Brunet and his wife lease the Theater. Robert and Brian Brunet (the Brunets) are corporate officers of Barbeque of

2

New Orleans, Inc. (Barbeque), which manages the Theater.  James Estopinal is its rave promoter.

In August 2000, the DEA raided the Theater.  As a result, charges were brought against the Brunets and Estopinal under 21 U.S.C. § 856(a)(2) (unlawful to manage building and knowingly and intentionally make it available for controlled substance use). *United States v. Brunet*, No. 01-CR-10 (E.D. La. filed 12 January 2001).  The charges were dismissed in March 2001.

Barbeque was then charged with conspiracy to violate § 856(a)(2).  *United States v. Barbeque of New Orleans, Inc.*, No. 01-CR-153 (E.D. La. filed 13 June 2001).  Pursuant to a plea agreement, Barbeque pled guilty to the charge and agreed, *inter alia*, that it, the Brunets, "and any other corporation or business that these two individuals are associated with" would

> take all reasonable steps to prohibit the introduction of infant pacifiers or any objects in the shape of a pacifier, objects that glow, including but not limited to glow sticks and flashing rings, vapor rub products and vapor inhalers, dust masks or masks of any description by any person entering a concert or an event where an admission is charged or at the State Palace Theater.

In addition, Barbeque and the Brunets agreed:  (1) not to introduce, sell, or distribute the above listed items, as well as not provide masseurs, massage tables, or "chill rooms" (kept 15 degrees cooler than the rest of the building); and (2) to contact the New Orleans Police Department if they or their employees

3

observe the sale or possession of controlled substances. (These last two terms, made part of the special condition in the subsequent criminal judgment, are not at issue. At issue is only the above-quoted plea provision that was also made part of that special condition.)

In August 2001, the district court accepted the Federal Rule of Criminal Procedure 11 plea agreement. It then entered a final judgment and probation order (criminal judgment), sentencing Barbeque to five-years probation and a $100,000 fine, and including the plea agreement terms. As noted, the above-quoted plea provision was included in the criminal judgment as part of the special condition. (Hereinafter, that plea provision is usually referred to as the special condition.)

The items listed in the special condition are all linked to ecstasy use, which causes heightened physical sensations. Objects that glow provide enhanced visual stimulation. (Glowsticks are also an integral part of dancing at raves.) Ecstasy users wear dust masks, onto which vapor rub is spread, to stimulate olfactory sensations. Finally, pacifiers alleviate trismus (tightening of the jaw muscles) and bruxism (grinding of teeth) caused by ecstasy use.

Even before the plea agreement was accepted by the district court, Barbeque and the Brunets implemented a policy enforcing the substance of the plea provision. That policy allows individuals to

4

return the items to their vehicles or leave them to be retrieved. (Nonetheless, the Theater's security guards have, at times, violated this policy and confiscated or disposed of these items.) Electronic music, dancing, and laser light shows continue at these raves. Since the implementation of this policy, however, far fewer individuals have been transported to a hospital due to illegal drug use; from February 2001 to December 2001, the closest hospital received no one for drug overdoses connected with the Theater.

Approximately two weeks after entry of the criminal judgment in August 2001, Plaintiffs filed a class action contending the special condition violated their constitutional rights. The named plaintiffs are: a founding member of an electronic music band whose performances include glowstick costumes decorated to create a porcupine effect; a member of the United States Air Force's saber drill team, who has adapted its acrobatic sword techniques to be performed with glowsticks and who also wears a pacifier around his neck at raves; and a performance artist, who is identified by his elaborate glowing masks and costumes.

Plaintiffs claim the special condition violates their First Amendment right to freedom of expression. In this regard, they assert glowsticks and masks are an integral part of their performance and also claim they wear pacifiers to identify themselves with the rave culture. (Concerning the First Amendment, they have not explained, however, the significance of vapor rub.)

5

In addition, Plaintiffs claim Fourth and Fifth Amendment violations, asserting that the Theater's confiscation of their items amounts to an unreasonable seizure or violation of their property rights.

Within a week of this action's being filed, the district judge, who had earlier accepted the plea agreement and entered the criminal judgment, granted a preliminary injunction in this civil action against the Government's "enforcing the [above-quoted] provision of the plea agreement". That November, the district court certified a class. Following a bench trial on 17 December 2001, the district court ruled in February 2002 that Plaintiffs' First Amendment rights were violated. (It did not address the Fourth and Fifth Amendment claims.) As a result, the district court permanently enjoined enforcement of the plea provision, using the language employed in the preliminary injunction. (The district court enjoined enforcement of the "provision of the plea agreement". In fact, as discussed, it enjoined a special condition in the criminal judgment.)

In its ruling, the district court first held, *inter alia*, that it was "not trying to revoke its acceptance of [the] plea agreement" and that then Federal Rule of Criminal Procedure 11(e)(1) (court shall not participate in plea agreement discussions; provision now at Rule 11(c)(1) (as amended 1 December 2002)) did not apply in this civil action, as discussed *infra*. (It

6

did not address, however, the fact that the plea provision at issue became a special condition in the final criminal judgment.)  As discussed *infra*, the district court held Plaintiffs have standing to bring a third-party constitutional challenge to a plea agreement.  It also ruled that the requisite state action is present because of the combination of the Government's action and those of the private actors required to comply with the special condition.

In its First Amendment ruling, the district court found that the plea agreement evinced no improper purpose or motive by the Government to eliminate rave culture.  Nevertheless, it reasoned: although elimination of ecstasy use was a significant, legitimate governmental interest, the plea provision was not narrowly tailored; the Government could not ban legal, expressive items simply because they are associated with illegal activities; and there was no evidence that the ban reduced ecstasy use. ***McClure v. Ashcroft***, No. 01-2573 (E.D. La. 1 Feb. 2002).  (As noted, the court did not address Plaintiffs' Fourth and Fifth Amendment claims.)

## II.

Permanent injunctions are reviewed for abuse of discretion. *E.g.,* ***Peaches Entm't Corp. v. Entm't Repertoire Assoc., Inc.***, 62 F.3d 690, 693 (5th Cir. 1995).  A district court abuses its discretion if it:  (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3)

7

misapplies the law to the facts. *Id*. Standing, an issue of law, receives plenary review. ***Maiz v. Virani***, 311 F.3d 334, 337 (5th Cir. 2002).

The standing doctrine defines and limits the role of the judiciary and is a threshold inquiry to adjudication. *E.g.,* ***Warth v. Seldin***, 422 U.S. 490, 517-18 (1975). The inquiry has two components: constitutional limits, based on the case-and-controversy clause in Article III of the Constitution; and prudential limits, crafted by the courts. ***Raines v. Byrd***, 521 U.S. 811, 820 (1997). "In both dimensions it is founded on concern about the proper — and properly limited — role of the courts in a democratic society." ***Warth***, 422 U.S. at 498.

As a result, Plaintiffs must establish that "their claimed injury is personal, particularized, concrete, *and otherwise judicially cognizable*". ***Raines***, 521 U.S. at 820 (emphasis added). No authority need be cited for the rule that courts should avoid constitutional decisions as much as possible. Therefore, for disposing of this appeal, the better course is through prudential considerations, rather than through constitutional limits involving more difficult issues, such as state action, as discussed *infra*.

Accordingly, as discussed in part II.A. *infra*, we assume *arguendo* that Plaintiffs have satisfied the Article III requirements of "personal", "particularized", and "concrete" injury. And, as discussed in part II.B. *infra*, because of

8

prudential considerations, including the finality of criminal judgments and the limited role of the judiciary, Plaintiffs' injury is not "judicially cognizable".

## A.

Article III case-and-controversy requirements provide the "irreducible constitutional minimum" to demonstrate an action is justiciable. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475 (1982) ("We need not mince words when we say that the concept of 'Art. III standing' has not been defined with complete consistency.... But of one thing we may be sure: Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States.").

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).

Plaintiffs have shown a particularized, actual injury. They assert that the requisite state action exists because the special condition requires Barbeque and the Brunets to violate Plaintiffs'

9

First, Fourth, and Fifth Amendment rights. *E.g., **Peterson v. Greenville***, 373 U.S. 244, 247-48 (1963) (state action where restaurant owner enforces city ordinance requiring segregation). Plaintiffs have shown that members of their class use glowsticks and masks to dance, *e.g., **Schad v. Borough of Mt. Ephraim***, 452 U.S. 61, 65 (1981) (live musical entertainment falls within First Amendment), and wear pacifiers for the purpose of expressing adherence to the rave culture, *e.g., **Texas v. Johnson***, 491 U.S. 397, 404 (1989) (expressive conduct if intent to convey particularized message and likelihood message understood by those viewing it). (As noted, Plaintiffs have not shown, however, that vapor rub was used for expressive purposes.) Further, in alleged support of their Fourth and Fifth Amendment claims, they have shown that their property was seized when they attempted to enter an electronic music concert at the Theater. (On the other hand, these seizures are arguably not state action because, among other things, the special condition only requires Barbeque and the Brunets to "take reasonable steps to prohibit the introduction" of these items into the Theater; restated, it does not require their confiscation.) As discussed, we assume *arguendo* that state action has been shown for each claim.

Plaintiffs have also shown they plan to attend raves in the future and use glowsticks and masks in their performances and wear pacifiers. *E.g., **Friends of the Earth, Inc.***, 528 U.S. at 182-82

10

(injury-in-fact where plaintiff intended to use polluted site for recreating, if statute was enforced to prevent pollution). Along this line, the class is defined by the district court as

> [a]ll persons present and future who have attended an electronic music concert at State Palace Theater **and** who either suffered seizure and confiscation of their property pursuant to the ... plea agreement ... or have suffered artistic censorship or loss of the use of their property ... due to the threat of enforcement of [the] plea agreement.

(Emphasis in original.)

Showing the requisite causation and redressability is more difficult.

> When ... a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*[, (third party)] causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction — and perhaps on the response of others as well.... [I]t becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.... Thus when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.

*Lujan*, 504 U.S. at 562 (citing *Warth*, 422 U.S. at 505, and *Allen v. Wright*, 468 U.S. 737, 758 (1984)) (emphasis in original; other internal quotations and citations omitted).

11

Accordingly, Plaintiffs' ability to show causation and redressability hinges on the response of Barbeque and the Brunets to the Government's enforcement of the special condition being enjoined. *Lujan* is instructive.

In *Lujan*, the Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, required federal agencies to consult with the Secretary of the Interior when their conduct would jeopardize endangered species. Although the Secretary promulgated a regulation requiring consultation for domestic, as well as foreign, conduct, the regulation was revised to require consultation only for domestic conduct.

Environmental conservation organizations brought an action against the Secretary, seeking to require him to promulgate a regulation making consultation necessary before agencies engaged in foreign conduct affecting endangered species. The Supreme Court denied standing, in part, because the Secretary's regulations were not binding on the agencies; the environmental organizations could not show a likelihood the injury would be redressed; and the agencies might choose not to comply with the regulation. *Lujan*, 504 U.S. at 568-72.

Likewise, Plaintiffs' relief hinges on third-party actions. Plaintiffs seek to enjoin the Government's enforcement of the challenged special condition. Plaintiffs concede, however, that Barbeque and the Brunets could implement (and have implemented) a

12

policy on their own. Significantly, after the August 2000 raid (before a plea agreement was finalized) and after the preliminary injunction was granted, Barbeque and the Brunets adhered to a policy of prohibiting glowsticks, pacifiers, vapor rub, and masks in the Theater.

Nonetheless, this case may be distinguishable from *Lujan*. There, the court order required the subject of the suit, the Secretary of the Interior, to promulgate non-binding regulations, which, if followed, would create more onerous duties on the third-party agencies. Here, Plaintiffs seek to enjoin the subject of their suit, the Government, from enforcing the special condition; this would *relieve* the third-parties in this case, Barbeque and the Brunets, of a duty.

There is evidence Barbeque and the Brunets enacted such a policy because of fear of future prosecution. Robert Brunet stated: "I personally [have] no desire to keep these items out of the ... Theater.... If there was no plea agreement, and no fear of being prosecuted, I would have permitted these items [at past events]". If the permanent injunction against enforcing the special condition is upheld, such fear of future prosecution may be alleviated, and, arguably, Barbeque and the Brunets would change the policy. Plaintiffs have sufficiently shown they will continue to attend raves at the Theater and wish to bring the prohibited items.

13

In any event, and as discussed *supra*, we assume *arguendo* that Plaintiffs meet the Article III requirements for standing. Nevertheless, as also discussed *supra*, because the special condition is part of a final criminal judgment, prudential considerations preclude Plaintiffs' having standing, as further discussed *infra*.

B.

"Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." ***Valley Forge Christian College***, 454 U.S. at 475. "Prudential standing limitations help courts identify proper questions of judicial adjudication, and further define the judiciary's role in the separation of powers." ***Ruiz v. Estelle***, 161 F.3d 814, 829 n.22 (1998). *See* ***Valley Forge Christian College***, 454 U.S. at 472; ***Warth***, 422 U.S. at 498.

Along this line, Plaintiffs acknowledge that third parties lack standing in criminal proceedings. Nevertheless, *without citing authority*, they assert that a criminal judgment may be challenged through a civil action where plaintiffs claim violation of their constitutionally-protected rights. Consistent with this contention, the district court ruled: when third-party constitutional rights are violated by a plea agreement, that third-party has standing.

> This standing arises from the fact that the
> government is allegedly violating an inherent

14

> right we all, as Americans, enjoy. The fact
> that the government is allegedly violating the
> rights of all through a plea agreement with a
> criminal defendant does not bear on a civil
> plaintiff's standing to redress the alleged
> wrong that he is suffering.

*McClure*, No. 01-2573, slip op. at 5. Because of the importance of both the finality of criminal judgments and the judiciary's limited role, the district court erred in considering Plaintiffs' constitutional claims.

"The policy of finality is, and should be, strong." *Bros Inc. v. W.E. Grace Manufacturing Co.*, 320 F.2d 594, 610 (5th Cir. 1963). Accordingly, judgments, particularly criminal judgments, should not be lightly disturbed. *Cobbledick v. United States*, 309 U.S. 323, 326 (1940). "The desirability of order and predictability in the judicial process calls for exercise of caution in such matters." *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 400 (5th Cir. 1981). "Inroads on the concept of finality tend to undermine confidence in the integrity of our procedures.... Moreover, increased volume of judicial work associated with the processing of collateral attacks inevitably impairs and delays the orderly administration of justice." *United States v. Addonizio*, 442 U.S. 178, 185 n.11 (1979). While this last statement was made in the context of 28 U.S.C. § 2255 motions to vacate or correct sentences (discussed *infra*), it is no less true of third-party collateral attacks on final criminal judgments.

15

In this regard, criminal defendants did not even have a right to appeal until 1889. *Cobbledick*, 309 U.S. 323, 325 (1940). "[E]ncouragement of delay is fatal to the vindication of the criminal law." *Id*. at 325. The Supreme Court has recognized the importance of plea agreements to efficiently rendering criminal judgments:

> Disposition of charges after plea discussions ... *lead to prompt and largely final disposition of most criminal cases*; it avoids much of the corrosive impact of enforced idleness during pre-trial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty....

*Santobello v. New York*, 404 U.S. 257, 261 (1971) (emphasis added).

The standing doctrine protects final judgments from third-party collateral attacks. For example, even victims lack standing to challenge a criminal sentence. *United States v. Mindel*, 80 F.3d 394 (9th Cir. 1996) (beneficiary of criminal restitution order has no standing to challenge modification of sentence to rescind restitution order); *United States v. Johnson*, 983 F.2d 216 (11th Cir. 1993) (beneficiary of criminal restitution order has no standing to challenge revocation of probation when restitution not paid); *United States v. Kelley*, 997 F.2d 806, 807-08 (10th Cir. 1993) (victim has no standing to appeal denial of motion to intervene in criminal proceeding); *United States v. Grundhoefer*,

16

916 F.2d 788, 791 (2nd Cir. 1990) ("[t]he direct, distinct, and palpable injury in a criminal proceeding plainly falls only on the defendant who is being sentenced"). *See also* **Gilmore v. Utah**, 429 U.S. 1012, 1013-17 (1976) (majority held defendant knowingly and intelligently waived all federal rights to challenge conviction and did not address standing; Burger, C.J. and Powell, J., concurring, opined that defendant's mother lacked standing to seek a stay of execution for her son).

Likewise, the Supreme Court has denied standing to parties challenging, on constitutional grounds, governmental policies to prosecute individuals for crimes. **Linda R.S. v. Richard D.**, 410 U.S. 614, 619 (1973) (mother of illegitimate child sought order compelling State to prosecute father under statute requiring parents to support children). At least one federal circuit has considered **Linda R.S.** as supporting the proposition that courts should avoid the "spread of judicial authority". **Northwest Airlines, Inc. v. Federal Aviation Administration**, 795 F.2d 195, 203 n.2 (D.C. Cir. 1986).

In this regard, the district court enjoined a member of the executive branch, the Attorney General, from enforcing the special condition. The Supreme Court has counseled judicial restraint in impinging on the ability of other branches to carry out their duties. *E.g.,* **Raines**, 521 U.S. at 819-20 ("[O]ur standing inquiry has been especially rigorous when reaching the merits of the

17

dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.").

As another example, the Federal Rules of Criminal Procedure express an aversion to allowing third-party interference with sentencing. For instance, except for a provision requiring the district court to address a victim of violence or sexual abuse if present at sentencing, FED. R. CRIM. P. 32(i)(4)(B), the Rules contemplate no role for third-parties.

Similarly, the district court has a limited role regarding plea agreements. It cannot participate in plea discussions. FED. R. CRIM. P. 11(c)(1). The district court may accept or reject a plea agreement after one is reached; but, generally, once the court has accepted the agreement, it may not subsequently reject or modify it.

> As the express terms of Rule 11 reveal, the district court is barred from intruding upon negotiations of plea agreements. The court's role is limited to the approval or rejection of an agreement once finalized, and its options in that regard are few.... *Once the court has accepted a plea agreement, however, it is, as a general rule, bound by the terms of that agreement. There is no provision in the rules allowing a court to reject or modify an agreement once accepted.*

*United States v. Ritsema*, 89 F.3d 392, 398-99 (7th Cir. 1996) (collecting cases standing for above proposition and noting one limited exception: defendant's fraud) (internal citation omitted;

18

emphasis added). *See **United States v. Capaldi***, 134 F.3d 307, 308 (5th Cir.) (acknowledging rule stated in ***Ritsema***), *cert. denied*, 524 U.S. 910 (1998).

Rule 11, as amended on 1 December 2002, expressly acknowledges this proposition. Where the parties agree to a specific sentence, "such a recommendation or request binds the court once the court accepts the plea agreement". FED. R. CRIM. P. 11(c)(1)(C). Further, subsection (e), "Finality of a Guilty ... Plea", was added to Rule 11: "After the court imposes sentence, the defendant may not withdraw a plea of guilty ..., and the plea may be set aside only on direct appeal or collateral attack". FED. R. CRIM. P. 11(e). This section reinforces the finality of accepted guilty pleas and "makes it clear that it is not possible for a defendant to withdraw a plea after sentence is imposed". FED. R. CRIM. P. 11, Advisory Committee Notes.

Generally, the district court may reduce or modify a sentence in only four circumstances: (1) on remand, if, on appeal, the sentence was held to be imposed in violation of the law, 18 U.S.C. § 3742; (2) upon a Government motion made within one year of sentencing, if the defendant provided substantial assistance and a reduction accords with the sentencing guidelines, FED. R. CRIM. P. 35(b)(1); (3) upon a Government motion more than one year after sentencing, if the defendant provided information to the Government not known within one year, which was not useful within one year, or whose usefulness was not reasonably anticipated within one year,

FED. R. CRIM. P. 35(b)(2); and (4) within seven days of sentence imposition to correct an arithmetical, technical, or other clear error, FED. R. CRIM. P. 35(a).  Before a 1987 amendment to Rule 35, the district court could correct an "illegal sentence" at any time or "a sentence imposed in an illegal manner" within 120 days of imposition.  FED. R. CRIM. P. 35(a), Pub. L. No. 98-473 (amended 1987).

In conjunction with the Sentencing Reform Act of 1984, Congress amended Rule 35.  Sentencing Reform Act of 1984, H.J. Res. 648, 98th Cong. § 215(b) (2nd Sess. 1984).  "The underlying purpose was to impose on the new sentencing system a requirement that the sentence imposed in the public forum during the sentencing hearing would remain constant, immune from later modification."  *United States v. Lopez*, 26 F.3d 512, 517 (5th Cir. 1994) (citing *United States v. Cook*, 890 F.2d 672, 674 (4th Cir. 1989)).  Further, Congress rejected a proposal to allow modification of sentences, within 120 days, based on new factual information.  It "believed that such a change would inject into Rule 35 a degree of post-sentencing discretion which would raise doubts about the finality of determinate sentencing that Congress attempted to resolve by eliminating former Rule 35(a) [allowing modification for illegal sentences]".  *Id*. at 519 (citing Rule 35 Advisory Committee notes).

As another example of the need to uphold the finality of criminal judgments, a person in custody pursuant to a federal

sentence may collaterally attack that sentence through a 28 U.S.C. § 2255 motion to vacate, set aside, or correct his sentence. Such motions must be filed within one year of four listed events, such as when "the judgment of conviction becomes final". 28 U.S.C. § 2255. Further, a district court can consider a successive § 2255 motion only if a court of appeals first certifies the motion concerns: (1) "newly-discovered evidence that" shows "by clear and convincing evidence that no reasonable factfinder" could find guilt; or (2) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable". *Id*. Again, these restrictions illustrate that a district court may disturb final criminal judgments only in extremely limited circumstances.

Finally, special conditions in criminal judgments often affect third-party constitutional interests. It is within the court's discretion, however, to impose them "to the extent that such conditions involve only such deprivations of liberty or property as are reasonably necessary [to effectuate sentencing purposes]". 18 U.S.C. § 3563(b). Section 3563 provides, as an example, requiring the defendant: (1) to refrain from frequenting certain places or associating with certain people, § 3563(b)(6); (2) to reside, or refrain from residing, in certain locations, § 3563(b)(13); or (3) to refrain from pursuing certain employment, § 3563(b)(5). Each of these conditions necessarily impinges third-party constitutional rights of free speech and association. Yet, courts have approved

21

such conditions. *E.g., **United States v. Phipps***, 319 F.3d 177 (5th Cir. 2003) (supervised release condition prohibiting possession of sexually-oriented materials); ***United States v. Paul***, 274 F.3d 155 (5th Cir. 2001) (supervised release condition prohibiting visiting locations frequented by minors), *cert. denied*, 535 U.S. 1002 (2002).

The district court accepted the plea on 3 August 2001 and entered a final criminal judgment. By later enjoining the special condition, it, in essence, rejected the plea after it became final. Moreover, the district court violated the principles of finality embodied in, *inter alia*, the Federal Rules of Criminal Procedure, case-law holding third-parties lack standing to challenge final criminal judgments, and principles of judicial restraint and the separation of powers.

Based on the foregoing, we hold: In a civil proceeding, at least under circumstances similar to those presented in this action, a third-party collateral attack on a final criminal judgment is nonjusticiable. We leave for another day the question whether circumstances in a given action might be so extraordinary as to confer justiciability. The present action is not so extraordinary that we need consider whether principles of finality and judicial restraint could ever give way. For example, the district court found that the Government had no improper purpose for imposing the challenged special condition. As another example,

discussed *supra*, associational and other constitutional rights are commonly disturbed by imposition of criminal judgments. *See also*, ***Froehlich v. State of Wisconsin***, 196 F.3d 800, 802 (7th Cir. 1999) (children of incarcerated mother have no right to challenge her transfer to distant prison, but stating claim would have been stronger if shown Government intended to break up family); ***Southerland v. Thigpen***, 784 F.2d 713, 717 (5th Cir. 1986) (child not constitutionally entitled to breast feeding by incarcerated mother). And, the special condition neither requires nor authorizes the criminal defendant to do, or to refrain from doing, anything it would not be legally free to do or refrain from doing in the absence of the special condition.

## III.

The permanent injunction against the Government's enforcing the plea provision which became part of the special condition in the final judgment of conviction in ***United States v. Barbeque***, No. 01-CR-153 (E.D. La. filed 13 June 2001), is **VACATED**; and this civil action is **REMANDED** to the district court to be **DISMISSED** for lack of jurisdiction. The mandate shall issue forthwith.

*INJUNCTION VACATED; REMANDED*